May it please the Court, Kenneth O. Streicher, for the appellant, H. Jason Gold, of the Wiley The trustee seeks to reverse the District Court's affirmance of the Bankruptcy Court's decision that Gateway Bank, who is the appellee, established an affirmative defense under 548C of the Bankruptcy Code that it received transfers of FMI's property, or debtor's property, fraudulent transfers for value and in good faith. This appeal focuses on just three transfers. They were just over a million dollars, and they were made on December 11, 2007, to repurchase three loans made by Gateway to one borrower named Hua, H-U-A, Zhu, X-U, loans which Gateway had funded on or about August 23, 2007. Although the complaint and the amended complaint had state law claims under Virginia law, the claims at issue here in this appeal are limited to avoidance of the FMI payments, the transfers by the debtor, on the Zhu loans that were avoidable under 548A1 of the Bankruptcy Code as intentional fraudulent. As I understand the way this operation worked, the repurchasing of the loans was a fairly, from FMI repurchasing the loans from Gateway, was a fairly standard practice that if the loans didn't find a buyer on the secondary market, either as a result of Gateway or FMI's efforts, then at the end of the trail, FMI repurchased the loans from Gateway. So if that's true, the repurchase wasn't anything out of the ordinary, was it? Well, it was out of the ordinary with respect to these particular loans, which is why we've focused this appeal on these loans, on just the Zhu loans. The testimony I traveled dealt with many, many loans. And what we're focusing this appeal on are the facts relating to the Zhu loans, which there was evidence of irregularities connected with those loans, and the fact that they had been transferred or rejected by three different investors, and that there was evidence that the expert testimony showed that they should have been suspicious about these loans. Well, but the fact that they were rejected by the different investors, I mean, it was a down market. The secondary mortgage loans were, they were having a hard time unloading them at the time that these loans were rejected, weren't they? Well, let's put it this way. I mean, at the time that, in 2007, there was turmoil in the market, but each time that they tried to submit a loan to an investor, the investor had obligated... These were subprime loans? Well, I don't think they were subprime loans. These were interest-only loans. That's the only thing that they were identified. They weren't identified as subprime. And they had a commitment from an investor every time they sold a loan. They had what they called these locks, which are in the file, and every... So an investor knew when they committed to buy these loans that, at least on paper, that this was a... And Mr. Kenney's comment about bogus. Is that your argument, or is there more to it? Well, you focus on the essence of it. I mean, the Kenney email specifically... I'm saying, is that your argument, or is there more to it factually? Is that it? It may be enough. I'm just asking. Well, when you say the other... There's evidence... I didn't say there was other evidence. I said the evidence that you pointed to, that other institutions had rejected those loans. I thought you said that. Didn't you say that? Yes, I did. But that's not... But there's more to it than just the fact that other institutions had rejected the loans. What else is it? Besides that and Mr. Kenney's statement of bogus, what else do you say would force us to find that there was bad faith or lack of good faith in this case? The fact that there was evidence, in addition to the Kenney emails, there was evidence at trial that these loans were problematic and they stood out from all the rest of the loans. Those facts, would that force a finding of lack of good faith as a matter of law? Well, certainly, if you accept the Kenney emails... Take the Kenney emails out for a minute and look at Judge Shedd's question with respect to the other evidence. Does this force us to make a finding reversing the lower courts of bad faith? Well, the answer is yes, and let me explain why. Under the 548C analysis of what you have to establish, and the burden is on the defendant to establish that, the test, and it's articulated in both our briefs, is articulated in the Bayou case, which says if you're on inquiry notice, if you know, and that's what we're saying, the Kenney emails establish actual knowledge of the fraudulent purpose of the transfer, then you don't have a 548C defense. You're deemed to have knowledge and you accept the money at the risk of having to pay it back. Or if the other prong of that is should have known, and that's been interpreted to mean that if you're on inquiry notice of the possible fraudulent purpose of the transfer that you receive, then you are required to conduct and prove at trial that you did a reasonably diligent investigation measured by the standards of that particular industry, and that you did that investigation and either did not uncover the fraud. And so if you uncovered the fraud, obviously. What evidence specifically put them on inquiry notice? There was. That's your argument, they're on inquiry notice? Alternatively to the actual, the second, you know, the first point is, the first argument is they knew because the test is knew or should have known. So we're saying they knew, affirmatively knew, objectively knew. Because of these emails. Because of the email. The second point, there was other evidence in addition to the emails that also established that they should have been suspicious about the loans and would have been on inquiry notice about the loans. That evidence is what? That includes being returned three times by three different investors, which the evidence was, and the expert testimony was, that if your loan has been returned three times, you need to be suspicious of the loans. We also have the fact that. I'm not sure I followed that because why wouldn't, why couldn't that just be evidence that the loans were rejected by the other investors simply as a business proposition? Well, it's not a business proposition anymore. I mean, when you have a sale of a loan to an investor. Investors pick up some loans because they think they're a good deal business-wise and they decline and they pass on loans. And as I understand it, in this period of time, investors were passing on loans all the time. They were much more difficult to sell. And from 2007 until the fall of 2008 or mid-2009, the market for this sort of loan became, the market became progressively skeptical of this sort of loan. And I don't understand why that would be other evidence of bad faith.  And the evidence was that investors were changing their requirements from time to time, and that's what made it difficult in some instances to find investors to pick up some of these loans in the secondary market. But in each case here, you had an investor committing, because the bank gateway needed that insurance to ship the loan to the investor. The way this process worked, after the loan was closed, the note would go back to gateway. The original note goes back to gateway. In this case, we know there were many multiple loans because he tried to, under this scheme, he sent these loans to several banks. We know the First Tennessee sent money to banks, and we've seen evidence in the record that Wells Fargo bought these notes. But the point is— I understand your view of it now. This was the subject. The gateway asserted an affirmative defense. Yes. The affirmative defense was that of good faith. Both the bankruptcy court and the district court, as I understand it, found that the affirmative defense was satisfied. Now, did both courts hold a hearing on this matter? There was a two-day trial in the bankruptcy court, and there was— What about the district court? There was an argument, an appellate argument before the district court. There was an argument before the district court. The district court affirmed the finding of good faith after the two-day trial. The district court did find that. What do you say is the standard of review of that particular finding? Well, the bankruptcy court's findings, the factual findings of good faith are viewed under the clearly erroneous standard. The district court's decision is under a de novo standard because that's a legal decision, reviewing what the bankruptcy court did. Let me say this about the district court, and we've explained that in our brief. The district court, in evaluating what the bankruptcy court did, did not correctly apply the appropriate standard in determining whether they had reached the 548C. But that particular factual finding, you agree, is reviewed by an appellate court under a clearly erroneous standard? Well, the district court's ruling where it did not reach inquiry notice is a legal matter, a legal decision. I understand that. I'm talking about the finding of the bankruptcy court after the two-day trial. The further review of that finding would be under a clearly erroneous standard, would it not? Yes. And that's a tall mountain to climb. Well, it's a tall mountain, but it's something that can be done. Otherwise, we wouldn't have appellate courts to question as to whether the court, after reviewing the record and all the evidence and the arguments and everything else that went before. Now, let's talk about the Kenney letter for a minute. Wasn't that explored at some length before the bankruptcy judge? Yes, it was considered, and the bankruptcy court said in his opinion. And it was a question of the timing of the letter. Right. He said he could not relate the email back to the date of the transfer, is what the bankruptcy court said. But he also said that he couldn't find anything in the file to support that. How would it be clearly erroneous for the bankruptcy court to say, I'm not going to relate this letter back? Well, because the record and the evidence showed that after Gateway got paid on December 11, 2007, they essentially closed their books. There would be no further investigation. There was no evidence of any contact. So that when Mr. Kenney on January 11 indicated and told his subordinate that this is the guy who sold us these completely bogus loans, it reflects his state of mind on the date of the transfer. A month earlier. A month earlier, because there was nothing in between that time. Could he have thought about it and formed an opinion in that time frame? Where's the evidence that he necessarily thought that on the day of the transfer? That he necessarily formed that opinion on the day of the transfer? Well, we say it's from the facts that there's no evidence. Yes, correct. There's necessarily so, I said. Because see this, you could have this argument today, and in a month from now you could tell somebody, man, that panel was tough on me. That doesn't mean that you thought it the second you walked out of here. You could have thought about it over the intervening days and said, you know, that panel was tough on me. The fact that you say it later, I'm just wondering, it seems to me that that argument of yours is not necessarily so. The fact that he said a month later those loans were bogus, that doesn't mean he formed the opinion that they were bogus based at that day. I mean. The day of the transfer. Well, I mean, the point is there was no evidence of any communication afterwards. That's fine. And there's also evidence that Mr. Kenny was a hands-on person who did a type two. None of that goes to my point, I don't think, do you? No, that you necessarily, I mean, what I'm trying to say to you that there was evidence that would have led to him. But just because there's evidence doesn't mean the fact finder has to accept your view of that evidence, does it? That's just my point. No, I mean, obviously, it doesn't have to, but we're trying to. I understand you want the court to, but why would we, why would any fact finder have to accept your version of those facts as correct? Because that's the only logical inference you can draw from the facts that were presented. No, it's not. What about the one I just said? That as an idea came to him between Christmas time. That's just as reasonable as anything else. Well, it's not reasonable when you think about the fact that Mr. Kenny was the hands-on person who controlled this. Yeah, but that doesn't mean he doesn't think about work after an occurrence, does it? I can't preclude the fact that he thought about it. Obviously, you can't do that. I know you don't want that to be accepted, but I don't understand your argument that it can't be accepted. Even if you accept that bogus has to mean what you say it means. Yes, but what we're saying is that it's an illogical conclusion to reach based on the evidence that there were problems with these loans. He's a hands-on person. There's no evidence of learning in between. The bank did not produce him to explain that at trial when it was their burden to establish the defense. He obviously was concerned about these loans based on emails he had sent to his subordinates back in September saying who was approving these loans. He cut them off on November 8th. Thank you. Thank you on that. I don't want to make him run over, I think. Okay. You have some rebuttal time, sir. We'll hear from you then. Mr. Schroll. May it please the court, James Schroll on behalf of Gateway Bank, the appellee. This case, the appeal, and, in fact, the whole case of the trustee was essentially a Hail Mary pass based on this one email that was sent. There were two emails. There was a second email that was related, but it was mainly the one, but you're right, Your Honor. There was a second email that also touched on the subject. Are the emails troubling? Are they close to a smoking gun? For some of the reasons that you touched on initially, no, they aren't a smoking gun for a number of reasons. The judge really focused on the fact that there was nothing whatsoever else in the record that would support the notion that it was a smoking gun. And there was affirmative testimony from somebody who worked side-by-side with Mr. Kenney that if Mr. Kenney had become aware that there was fraud or suspicion, he would have known about it. He was the kind of guy that would have been talking about it. And the fact is there was nothing in the record other than the two emails that suggested that there was anything suspicious in his mind. Could the court have found that email to create suspicion for at least some evidence of inquiry notice? Could the court have? Yes, the court could have, and the court to simply exercise its discretion not to after looking at the entire record. I think the trustee's case is based on the proposition that there's only one possible logical interpretation. That's the dictionary interpretation and that the judge was precluded from what he did, which was considered the entire record, and the absence of other information in the record either in the form of written testimony, written evidence, or otherwise. What I'm interested in in reviewing this case is whether there were departures from normal procedures. And as I understand it, it was customary if investors in the market didn't pick up the loan that FMI would repurchase it from Gateway. That that wasn't unusual, that that was what was ordinary, and in the case of a loan that wasn't picked up, that there was a repurchase from the bank. And then the other things I looked at were whether Gateway actually investigated FMI as a client in the manner that it investigated other clients. And a third thing that I was looking for was whether Gateway adequately reviewed the loans themselves. I want to know whether Gateway investigated FMI as a client, whether Gateway reviewed the substance of the loans themselves. And not just your view about it, but what evidence on those points was before the trier of fact. I want to know whether there were standard procedures, whether they were followed, and whether evidence of those standard procedures and compliance with them was before the trier of fact. Absolutely, in all of those instances. In fact, our entire case was predicated on trying to demonstrate that to the court. In response to your first question about the initial review before taking the mortgage lender on as a client, Alex Setho testified at great length about what steps were taken in order to do due diligence on the legitimacy and the financial capability of the mortgage lender before it was taken on. That testimony was presented. There was also testimony from Ms. Ruiz about the procedures, the intake procedures, the review of the particular loans themselves. And Mr. McGrath testified about the whole model, the business model, which goes to the point your Honor was making that what was the review of the loans. Because it was a purchase and sale facility, one of the critical things is that they were not underwriters of the loans. They were mere temporary bridge lenders of these loans. So they weren't looking at these loans as an underwriter. The takeout investors were really performing that task. And what was done, the paperwork would come in the day before the loan was to be funded, which was typical in the industry. And they followed the industry standards of looking at it to make sure that the paperwork was consistent with whatever loan program the takeout lender was offering. Were they offering an interest-only facility at that time or not? Did it have the criteria that the loan had to satisfy? And if it met those things, there was a specific checklist and there was a master mortgage agreement that we put into evidence and put on evidence that that was followed, that had the procedures, and that they were, in fact, followed. Was there any evidence of industry standards when the loans had been rejected by three other lenders? Yes, there was. Our expert witness, who the court found to be more credible and more helpful to the court, testified that it was not unusual for loans to be rejected more than once and that the procedures were followed in the instance where they were rejected because of the business model and the fact that our client made a very small, just a few hundred dollars on each transaction. It was an enormous potential risk for them to be stuck with this loan that was certainly inconsistent. Your expert even testified that the repurchase indicated the strength of the loans. That's correct, and it was critical. And what happened is that they would actually, that was part of what they were looking for also in the initial review, whether they had the financial capability of repurchasing the loan. But there were methods in order to keep shifting more risk and more burden onto FMI to incentivize them to ultimately repurchase the loan, and that was part of their business model also, which was shown in the record they followed. With respect to this issue of when there was a tipping point, during the testimony of Mr. Cisneros, Gateway's expert, the judge asked, you know, is there a point where there's a tipping point when the loans have been repurchased a number of times, for instance? And the immediate response was that after the third repurchase, the one that actually resulted in the transfer that went to my client, if they had continued to do business with this client in the future, they should have been more wary in the future. But at that point they were no longer doing any more business and there wasn't any reason to be doing any more investigation. So part of what the argument that we're hearing on appeal is that somehow Mr. Cisneros, in effect, recanted his testimony that there was no reason to be suspicious and was providing that missing testimony or that missing evidence by saying that the tipping point had already occurred. But I think if you review the record and review what was actually said, it was clear that the witness was talking about after the third repurchase there would be a tipping point. All right. I think we've read the briefs and understand your argument pretty well. Is there anything further you wish to add? No, Your Honor. Let me ask, I want to ask a question. Explain to me why the court should not have been, the fact finder should not have been bound to find Mr. Kinney's comment about bogus to indicate he had some knowledge or at least was on inquiry notice about improprieties. Or is that not so? My question is why wasn't the fact finder clearly wrong about that finding? Partly, Your Honor's point that the impression could have been formed after the fact, after the transfer. And there's a comment in one of the cases we cited in our brief that . . . In other words, you think there's no indication when his assessment of it being bogus was formed, number one. Anything else? Also, what is the meaning of bogus? You think that bogus doesn't necessarily mean fraudulent under any standard of inquiry or any legal standard. It's just bogus might mean those people are bogus. I don't really like dealing with them. I don't want to deal with them, that kind of thing. It goes back to the business model. I think your answer to that should be yes, and then you can go. Yes. Thank you. Somebody is understanding my question. I don't. Thank you. Yes, sir. Just to . . . You asked the question as to whether the e-mails be a smoking gun. And they obviously were a smoking gun in the sense that they acknowledged the bogus nature of the loans, which would put them on . . . give them knowledge that the transfers to buy those loans were for a fraudulent purpose because there's no legitimate reason to buy. But even if we accept that, how do we put that a month earlier? Well, the reason is that there are cases, and we cite them in a brief, that specifically in the instructions in the Bayou case that you can use subsequent events, if there's no other evidence, to . . . Sure, you could. . . to look at the transfer . . . You could, but the fact finder didn't find that. It goes back to Judge Wilkinson's question. So how can we find that's clear error? Well, certainly he concluded, no question about that, that these were bogus loans on January 11th. That's what he says. So he must have learned . . . there's nothing . . . there's no evidence that he learned something on January 11th. He must have known at some prior time to that. So he would have been . . . No, he learned by January 11th, or he called the bogus by January 11th. That's all we know from this record. Well, we also know that he was in charge of the unit. He would have learned . . . he would have been in the opportunity to have learned that these were bogus loans. There's plenty of facts that would have led him to determine that these were bogus loans. You just don't have the email that says this was . . . that he found this. He could have found it by virtue of the fact he terminated them. He could have found out by . . . there are a lot of ways he could have found out and probably did find out. If you had evidence of that in the record, you might be right. But there's no evidence . . . I don't want to belabor it, but even if we accept bogus to mean what it means, what evidence is there that necessarily means he made that determination before January 11th? The determination of it being bogus. Yeah. The only thing I can say is what we've . . . that there's information which likely led him to reach that conclusion prior to the transfers. There's no reason why he would have come to that conclusion afterwards. Still, it's all in the realm of speculation, isn't it? Well, it's not speculation. I mean, we have the entire email history that Gateway retained on this, and it's likely if there was some event that happened between December 11th that we would have a record of that in a file, and then Gateway did not produce Mr. Kenney to explain it. It was their burden to establish this defense in the first place. All we have is the head of their program telling his subordinate that these were bogus loans. So obviously he had learned it prior to his getting this inquiry. One can argue exactly the opposite, which is that if it was going to relate back, there should have been some evidence of . . . there should have been some earlier evidence of that same state of mind. Did you depose the witness? No. He was not able to be found. It's California. There was evidence in the record that . . . I thought you were suggesting just a minute ago that Gateway had somehow hidden him or not produced him, but your answer to my question about whether you called him as a witness is he's gone. So he would be gone for purposes of Gateway too, right? The only evidence about that is that they tried to locate him and they couldn't get him to sit for deposition. Of course, we would have been there as well. Just let me . . . That's because he thought the whole case was bogus. Maybe. He just wanted nothing to do with it. When you get to the term bogus, there was a lot of discussion in the trial about this statement of facts, and it's interesting in that term of art, bogus means phony, because that's the words that the U.S. attorney put into the statement of facts describing the loans that Tunisia was making. I just wanted to get back to . . . You had, Judge, said something about the fact that standard procedures were followed, and there was evidence that they were doing that with respect to most of the loans, and we don't dispute that. And then again, this is not a question of . . . Gateway is not another investor. Gateway is the funder of this. They don't buy the loans. They funded . . . They're the interim lender, and their purpose is to get out. And what we were saying and what our whole premise is that, fine, they put a lot of evidence about their checking out Tunisia at the beginning, how they followed their procedures, and so forth, but not with respect to these loans. And Mr. Cisneros' testimony was very clear that before they purchased those loans, they should have . . . this was past the tipping point, and they should have done something because three rejections is not normal, and it's something that they should have been suspicious about, and that they had reached a tipping point because the bankruptcy judge asked them specifically, are loans returned a red flag? And he said, not unless you get to, in effect, the tipping point. When you have it returned by three investors, you've reached that point. I think we understand the point. Thank you, Your Honor. We'll come down and greet counsel, and then we'll move into our next case.
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Dennis W. Shedd